# SHAFER *v.* SOUTH CAROLINA

No. 00–5250.   Argued January 9, 2001—Decided March 20, 2001

38

*David I. Bruck,* by appointment of the Court, 531 U. S. 1009, argued the cause for petitioner. With him on the briefs was *William N. Nettles.*

*Donald J. Zelenka,* Assistant Deputy Attorney General of South Carolina, argued the cause for respondent. With him on the brief were *Charlie Condon,* Attorney General, *John W. McIntosh,* Chief Deputy Attorney General, and *S. Creighton Waters,* Assistant Attorney General.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the right of a defendant in a capital case to inform the jury that, under the governing state law, he would not be eligible for parole in the event that the jury sentences him to life imprisonment. In *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), this Court held that where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant "to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel." *Ramdass* v. *Angelone,* 530 U. S. 156, 165 (2000) (plurality opinion) (describing *Simmons'* premise and plurality opinion). The case we now confront involves a death sentence returned by a jury instructed both that "life imprison-

---

*Sheri Lynn Johnson* and *John H. Blume* filed a brief for the Cornell Death Penalty Project as *amicus curiae.*

ment means until death of the offender," and that "[p]arole eligibility or ineligibility is not for your consideration." 340 S. C. 291, 297, 531 S. E. 2d 524, 527 (2000). It presents the question whether the South Carolina Supreme Court misread our precedent when it declared *Simmons* inapplicable to South Carolina's current sentencing scheme. We hold that South Carolina's Supreme Court incorrectly limited *Simmons* and therefore reverse that court's judgment.

## I

In April 1997, in the course of an attempted robbery in Union County, South Carolina, then-18-year-old Wesley Aaron Shafer, Jr., shot and killed a convenience store cashier. A grand jury indicted Shafer on charges of murder, attempted armed robbery, and criminal conspiracy. App. 2–4. Prior to trial, the prosecutor notified Shafer that the State would seek the death penalty for the murder. App. 4–5. In that pursuit, the prosecutor further informed Shafer, the State would present evidence of Shafer's "prior bad acts," as well as his "propensity for [future] violence and unlawful conduct." App. 6, 8.

Under South Carolina law, juries in capital cases consider guilt and sentencing in separate proceedings. S. C. Code Ann. §§ 16–3–20(A), (B) (2000 Cum. Supp.). In the initial (guilt phase) proceeding, the jury found Shafer guilty on all three charges. Governing the sentencing proceeding, South Carolina law instructs: "[T]he jury . . . shall hear additional evidence in extenuation, mitigation, or aggravation of the punishment. . . . The State, the defendant, and his counsel are permitted to present arguments for or against the sentence to be imposed." § 16–3–20(B).

Under amendments effective January 1, 1996, South Carolina capital jurors face two questions at sentencing. They decide first whether the State has proved beyond a reasonable doubt the existence of any statutory aggravating circumstance. If the jury fails to agree unanimously on

the presence of a statutory aggravator, "it shall not make a sentencing recommendation." § 16–3–20(C). "[T]he trial judge," in that event, "shall sentence the defendant to either life imprisonment or a mandatory minimum term of imprisonment for thirty years." *Ibid.;* see § 16–3–20(B). If, on the other hand, the jury unanimously finds a statutory aggravator, it then recommends one of two potential sentences— death or life imprisonment without the possibility of parole. §§ 16–3–20(A), (B). No sentencing option other than death or life without parole is available to the jury.

During the sentencing proceeding in Shafer's case, the State introduced evidence of his criminal record, past aggressive conduct, probation violations, and misbehavior in prison. The State urged the statutory aggravating circumstance that Shafer had committed the murder in the course of an attempted robbery while armed with a deadly weapon. See § 16–3–20(C)(a)(1)(d). The defense presented evidence of Shafer's abusive childhood and mental problems.

Near the completion of the parties' sentencing presentations, the trial judge conducted an *in camera* hearing on jury instructions. Shafer's counsel maintained that due process, and our decision in *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), required the judge to instruct that under South Carolina law a life sentence carries no possibility of parole. The prosecutor, in opposition, urged that Shafer was not entitled to a *Simmons* instruction because "the State has not argued at any point . . . that he would be a danger to anybody in the future, nor will we argue [that] in our closing argument . . . ." App. 161. Shafer's counsel replied: "The State cannot introduce evidence of future dangerousness, and then say we are not going to argue it and [thereby avoid] a charge on the law. . . . They have introduced [evidence of a] post arrest assault, [and] post arrest violations of the rules of the jail . . . . If you put a jailer on to say that [Shafer] is charged with assault . . . on [the jailer], that is future dangerousness." App. 162. Ruling that "the matter of parole

ineligibility will not be charged," the trial judge stated: "I find that future dangerousness [was] not argued[;] if it's argued [in the prosecutor's closing], it may become different." App. 164.

Unsuccessful in his effort to gain a court instruction on parole ineligibility, Shafer's counsel sought permission to impart the information to the jury himself. He sought leave to read in his closing argument lines from the controlling statute, §16-3-20(A), stating plainly that a life sentence in South Carolina carries no possibility of parole. App. 164–165.[1] In accord with the State's motion "to prevent the defense from arguing in their closing argument anything to the effect that [Shafer] will never get out of prison," App. 161, the judge denied the defense permission to read the statute's text to the jury. App. 165.

---

[1] Section 16-3-20(A) reads: "A person who is convicted of or pleads guilty to murder must be punished by death, by imprisonment for life, or by a mandatory minimum term of imprisonment for thirty years. If the State seeks the death penalty and a statutory aggravating circumstance is found beyond a reasonable doubt pursuant to subsections (B) and (C), and a recommendation of death is not made, the trial judge must impose a sentence of life imprisonment. For purposes of this section, 'life imprisonment' means until death of the offender. No person sentenced to life imprisonment pursuant to this section is eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by this section. No person sentenced to a mandatory minimum term of imprisonment for thirty years pursuant to this section is eligible for parole or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory minimum term of imprisonment for thirty years required by this section. ... When the Governor commutes a sentence of death to life imprisonment under the provisions of Section 14 of Article IV of the Constitution of South Carolina, 1895, the commutee is not eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, good conduct credits, education credits, or any other credits that would reduce the mandatory imprisonment required by this subsection."

After the prosecution's closing argument, and out of the presence of the jury, Shafer's counsel renewed his plea for "a life without parole charge." App. 188. He referred to his earlier submissions and urged, in addition, that the State had placed future dangerousness at issue during closing argument by repeating the words of an alarmed witness at the crime scene: "[T]hey [Shafer and his two accomplices] might come back, they might come back." App. 188. The trial judge denied the request. The judge "admit[ted he] had some concern [as to whether the State's] argument . . . had crossed the line," but in the end he found "that it comes close, but did not." App. 191–192.

Instructing the jury, the judge explained:

> "If you do not unanimously find the existence of the aggravating circumstance as set forth on the form [murder during the commission of an attempted armed robbery], you do not need to go any further.
>
> "If you find unanimously the existence of a statutory aggravating circumstance . . . you will go further and continue your deliberations.
>
> "Once you have unanimously found and signed as to the presence of an aggravated circumstance, you then further deliberate, and determine whether or not Wesley Aaron Shafer should be sentence[d] to life imprisonment or death." App. 202.

The judge twice told the jury, quoting words from § 16–3–20(A), that "life imprisonment means until the death of the defendant." App. 201; see App. 209. In line with his prior rulings, the judge did not instruct that a life sentence, if recommended by the jury, would be without parole. In the concluding portion of his charge, he told the jury that "the sentence you send to me by way of a recommendation will in fact be the sentence that the court imposes on the defendant." App. 215. After the judge instructed the jury, the defense once more renewed its "objection to the statutory

language [on parole ineligibility] not being charged," App. 221, and the judge again overruled the objection, App. 222.

Three hours and twenty-five minutes into its sentencing deliberations, the jury sent a note to the trial judge containing two questions:

"1) Is there any remote chance for someone convicted of murder to become elig[i]ble for parole?

"2) Under what conditions would someone convicted for murder be elig[i]ble." App. 253.

Shafer's counsel urged the court to read to the jury the following portion of § 16–3–20(A):

"If the State seeks the death penalty and a statutory aggravating circumstance is found beyond a reasonable doubt . . . and a recommendation of death is not made, the trial judge must impose a sentence of life imprisonment. For purposes of this section, *'life imprisonment' means until death of the offender.* **No person sentenced to life imprisonment pursuant to this section is eligible for parole, community supervision, or any early release program, nor is the person eligible to receive any work credits, education credits, good conduct credits, or any other credits that would reduce the mandatory life imprisonment required by this section.**" App. 226 (emphasis added).

He argued that the court's charge, which partially quoted from § 16–3–20 (above in italics), but omitted the provision's concluding sentence (above in boldface), had left the jurors confused about Shafer's parole eligibility. App. 226. The State adhered to its position that "the jury should not be informed as to any parole eligibility." App. 223. South Carolina law, the prosecutor insisted, required the judge to "instruct the jury that it shall not consider parole eligibility in reaching its decision, and that the term life imprisonment and a death sentence should be understood in their ordinary and plain meaning." App. 223–224.

The trial judge decided "not . . . to charge the jury about parole ineligibility," App. 229, and informed counsel that he would instruct:

> "Your consideration is restricted to what sentence to recommend. I will, as trial judge, impose the sentence you recommend. Section 16–3–20 of the South Carolina Code of Laws provides that for the purpose of this section life imprisonment means until the death of the offender. Parole eligibility is not for your consideration." App. 236.

Shafer's counsel asked the judge "to take off the language of parole eligibility." App. 236. The statement that "parole eligibility is not to be considered by [the jury]," counsel argued, "impl[ies] that it is available." App. 236; see App. 239 (Shafer's counsel reiterated: "[I]f you tell them they can't consider parole eligibility . . . that certainly implies that he may be eligible.").

Following counsels' arguments, and nearly an hour after the jury tendered its questions, the trial judge instructed:

> "Section 16–3–20 of our Code of Laws as applies to this case in the process we're in, states that, quote, for the purposes of this section life imprisonment means until the death of the offender, end quote.
>
> "Parole eligibility or ineligibility is not for your consideration." App. 240.

The jury returned some 80 minutes later. It unanimously found beyond a reasonable doubt the aggravating factor of murder while attempting armed robbery, and recommended the death penalty. App. 242–243. The jury was polled, and each member indicated his or her assent to the aggravated circumstance finding and to the death penalty recommendation. App. 243–248. Defense counsel asked that the jury be polled on "the specific question as to whether parole eligibility, their belief therein, gave rise to the verdict," and "whether juror number 233 who works for probation and pa-

role, expressed personal knowledge in the jury's deliberation outside of the evidence and the law given." App. 248. The judge denied both requests and imposed the death sentence. App. 248, 251.[2]

Shafer appealed his death sentence to the South Carolina Supreme Court. Noting our decision in *Simmons*, the South Carolina Supreme Court acknowledged that "[w]hen the State places the defendant's future dangerousness at issue and the only available alternative sentence to the death penalty is life imprisonment without parole, due process entitles the defendant to inform the jury he is parole ineligible." 340 S. C., at 297–298, 531 S. E. 2d, at 528. Without considering whether the prosecutor's evidentiary submissions or closing argument in fact placed Shafer's future dangerousness at issue, the court held *Simmons* generally inapplicable to South Carolina's "new sentencing scheme." Under that scheme, life without the possibility of parole and death are not the only authorized sentences, the court said, for there is a third potential sentence, "a mandatory minimum thirty year sentence." 340 S. C., at 298, 531 S. E. 2d, at 528 (citing *State* v. *Starnes*, 340 S. C. 312, 531 S. E. 2d 907 (2000) (decided the same day as *Shafer*)).[3]

---

[2] The judge also sentenced Shafer to consecutive terms of 20 years in prison for the attempted armed robbery and 5 years in prison for the criminal conspiracy. App. 251–252.

[3] South Carolina's "new" sentencing scheme changed the punishments available for a capital murder conviction that did not result in a death sentence. The capital sentencing law in effect at the time we decided *Simmons* read: "A person who is convicted of or pleads guilty to murder must be punished by death or by imprisonment for life and is not eligible for parole until the service of twenty years; provided, however, that when the State seeks the death penalty and an aggravating circumstance is specifically found beyond a reasonable doubt . . . , and a recommendation of death is not made, the court must impose a sentence of life imprisonment without eligibility for parole until the service of thirty years." S. C. Code Ann. §16–3–20(A) (Supp. 1993). What made Simmons parole ineligible was the provision stating: "The board must not grant parole nor is parole authorized to any prisoner serving a sentence for a second or subsequent conviction, following a separate sentencing for a prior conviction, for vio-

Shafer had urged that a *Simmons* instruction was warranted under the new sentencing scheme, for when the jury serves as sentencer, *i. e.*, when it finds a statutory aggravating circumstance, sentencing discretion is limited to death or life without the possibility of parole. See 340 S. C., at 298, 531 S. E. 2d, at 528. The South Carolina Supreme Court read *Simmons* differently. In its view, "*Simmons* requires the trial judge instruct the jury the defendant is parole ineligible only if no other sentence than death, other than life without the possibility of parole, is *legally available* to the defendant." 340 S. C., at 298, 531 S. E. 2d, at 528 (emphasis in original) (citing *Simmons,* 512 U. S., at 178 (O'CONNOR, J., concurring in judgment)). "At the time [Shafer's] jury began its deliberations," the court observed, "three alternative sentences were available"; "[s]ince one of these alternatives to death was not life without the possibility of parole," the court concluded, "*Simmons* was inapplicable." 340 S. C., at 299, 531 S. E. 2d, at 528.

Chief Justice Finney dissented. "[T]he overriding principle to be drawn from *[Simmons],*" he stated, "is that due process is violated when a jury's speculative misunderstanding about a capital defendant's parole eligibility is allowed to go uncorrected." *Id.,* at 310, 531 S. E. 2d, at 534. Due process mandates reversal here, he concluded, because "the jury's inquiry prompted a misleading response which suggested parole was a possibility." *Ibid.* Moreover, Chief Justice Finney added, when "a capital jury inquires about parole," *id.,* at 310, n. 2, 531 S. E. 2d, at 534, n. 2, even if the question "is simply one of policy, as the majority suggests [it is], then why not adopt a policy which gives the jurors the simpl[e] truth: no parole." *Id.,* at 311, 531 S. E. 2d, at 534.

---

lent crimes . . . ." § 24–21–640. This latter provision has not been amended; however, it did not apply to Shafer. Here, we consider whether South Carolina's wholesale elimination of parole for capital defendants sentenced to life in prison, see S. C. Code Ann. § 16–3–20 (2000 Cum. Supp.), described *supra,* at 40–41, requires a *Simmons* instruction in all South Carolina capital cases in which future dangerousness is "at issue."

We granted certiorari, 530 U. S. 1306 (2000), to determine whether the South Carolina Supreme Court properly held *Simmons* inapplicable to the State's current sentencing regime. We conclude that South Carolina's Supreme Court misinterpreted *Simmons*, and we therefore reverse that court's judgment.

## II

South Carolina has consistently refused to inform the jury of a capital defendant's parole eligibility status.[4] We first confronted this practice in *Simmons*. The South Carolina sentencing scheme then in effect, S. C. Code Ann. §§ 16–3–20(A) and 24–21–610 (Supp. 1993), did not categorically preclude parole for capital defendants sentenced to life imprisonment, see *supra*, at 46–47, n. 3. Simmons, however, was parole ineligible under that scheme because of prior convictions for crimes of violence. See § 24–21–640; *Simmons*, 512 U. S., at 156 (plurality opinion); *id.*, at 176 (O'CONNOR, J., concurring in judgment). Simmons' jury, in a note to the judge during the penalty phase deliberations, asked: "Does the imposition of a life sentence carry with it the possibility of parole?" *Id.*, at 160 (plurality opinion). Over defense counsel's objection, the trial judge in *Simmons* instructed: "Do not consider parole or parole eligibility [in reaching your

---

[4] At the time we decided *Simmons* v. *South Carolina*, 512 U. S. 154 (1994), South Carolina was one of only three States—Pennsylvania and Virginia were the others—that "ha[d] a life-without-parole sentencing alternative to capital punishment for some or all convicted murderers but refuse[d] to inform sentencing juries of th[at] fact." *Id.*, at 168, n. 8. Since *Simmons*, Virginia has abandoned this practice. *Yarbrough* v. *Commonwealth*, 258 Va. 347, 374, 519 S. E. 2d 602, 616 (1999) ("[W]e hold that in the penalty-determination phase of a trial where the defendant has been convicted of capital murder, in response to a proffer of a proper instruction from the defendant prior to submitting the issue of penalty-determination to the jury or where the defendant asks for such an instruction following an inquiry from the jury during deliberations, the trial court shall instruct the jury that the words 'imprisonment for life' mean 'imprisonment for life without possibility of parole.'").

verdict]. That is not a proper issue for your consideration."
*Ibid.* After receiving this response from the court, Simmons' jury returned a sentence of death, which Simmons unsuccessfully sought to overturn on appeal to the South Carolina Supreme Court. *Id.,* at 160–161.

Mindful of the "longstanding practice of parole availability," *id.,* at 177 (O'CONNOR, J.), we recognized that Simmons' jury, charged to chose between death and life imprisonment, may have been misled. Given no clear definition of "life imprisonment" and told not to consider parole eligibility, that jury "reasonably may have believed that [Simmons] could be released on parole if he were not executed." *Id.,* at 161 (plurality opinion); see *id.,* at 177–178 (O'CONNOR, J.). It did not comport with due process, we held, for the State to "secur[e] a death sentence on the ground, at least in part, of [defendant's] future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its [only] noncapital sentencing alternative, namely, that life imprisonment meant life without parole." *Id.,* at 162 (plurality opinion); see *id.,* at 178 (O'CONNOR, J.) ("Where the State puts the defendant's future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury—by either argument or instruction—that he is parole ineligible.").

As earlier stated, see *supra,* at 46–47, the South Carolina Supreme Court held *Simmons* "inapplicable under the [State's] new sentencing scheme," 340 S. C., at 298, 531 S. E. 2d, at 528. *Simmons* is not triggered, the South Carolina court said, unless life without parole is "the only legally available sentence alternative to death." 340 S. C., at 298, 531 S. E. 2d, at 528. Currently, the court observed, when a capital case jury begins its sentencing deliberations, three alternative sentences are available: "1) death, 2) life without the possibility of parole, or 3) a mandatory minimum thirty year sentence." *Ibid.* "Since one of these alternatives to

death [is] not life without the possibility of parole," the court concluded, *Simmons* no longer constrains capital sentencing in South Carolina. 340 S. C., at 299, 531 S. E. 2d, at 528.

This reasoning might be persuasive if the jury's sentencing discretion encompassed the three choices the South Carolina court identified. But, that is not how the State's new scheme works. See *supra*, at 40–41. Under the law now governing, in any case in which the jury does not unanimously find a statutory aggravator, death is not a permissible sentence and *Simmons* has no relevance. In such a case, the judge alone becomes the sentencer. S. C. Code Ann. § 16–3–20(C) (2000 Cum. Supp.). Only if the jury finds an aggravating circumstance does it decide on the sentence. *Ibid.* And when it makes that decision, as was the case in *Simmons*, only two sentences are legally available under South Carolina law: death or life without the possibility of parole. § 16–3–20(C).

The South Carolina Supreme Court was no doubt correct to this extent: At the time the trial judge instructed the jury in Shafer's case, it was indeed possible that Shafer would receive a sentence other than death or life without the possibility of parole. That is so because South Carolina, in line with other States, gives capital juries, at the penalty phase, discrete and sequential functions. Initially, capital juries serve as factfinders in determining whether an alleged aggravating circumstance exists. Once that factual threshold is passed, the jurors exercise discretion in determining the punishment that ought to be imposed. The trial judge in Shafer's case recognized the critical difference in the two functions. He charged that "[a] statutory aggravating circumstance is a fact, an incident, a detail or an occurrence," the existence of which must be found beyond a reasonable doubt. App. 203. Turning to the sentencing choice, he referred to considerations of "fairness and mercy," and the defendant's "moral culpability." App. 204. He also instructed

that the jury was free to decide "whether . . . for any reason or no reason at all Mr. Shafer should be sentenced to life imprisonment rather than to death." App. 203.

In sum, when the jury determines the existence of a statutory aggravator, a tightly circumscribed factual inquiry, none of *Simmons*' due process concerns arise. There are no "misunderstanding[s]" to avoid, no "false choice[s]" to guard against. See *Simmons*, 512 U. S., at 161 (plurality opinion). The jury, as aggravating circumstance factfinder, exercises no sentencing discretion itself. If no aggravator is found, the judge takes over and has sole authority to impose the mandatory minimum so heavily relied upon by the South Carolina Supreme Court. See *supra*, at 46–47, 49–50. It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole eligibility may become critical. Correspondingly, it is only at that stage that *Simmons* comes into play, a stage at which South Carolina law provides no third choice, no 30-year mandatory minimum, just death or life without parole. See *Ramdass*, 530 U. S., at 169 (*Simmons* applies where "as a legal matter, there is no possibility of parole if the *jury* decides the appropriate sentence is life in prison." (emphasis added)).[5] We therefore hold that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole.

---

[5] Tellingly, the State acknowledged at oral argument that if future dangerousness was a factor, and the jury first reported finding an aggravator before going on to its sentencing recommendation, a *Simmons* charge would at that point be required. Tr. of Oral Arg. 32. We see no significant difference between that situation and the one presented here. Nor does JUSTICE THOMAS' dissent in this case plausibly urge any such distinction. See *post*, at 56–58. If the jurors should be told life means no parole in the hypothesized bifurcated sentencing proceeding, they should be equally well informed in the actual uninterrupted proceeding.

## III

South Carolina offers two other grounds in support of the trial judge's refusal to give Shafer's requested parole ineligibility instruction. First, the State argues that the jury was properly informed of the law on parole ineligibility by the trial court's instructions and by defense counsel's own argument. Second, the State contends that no parole ineligibility instruction was required under *Simmons* because the State never argued Shafer would pose a future danger to society. We now turn to those arguments.

## A

"Even if this Court finds *Simmons* was triggered," the State urges, "the defense's closing argument and the judge's charge fulfilled the requirements of *Simmons*." Brief for Respondent 38. To support that contention, the State sets out defense counsel's closing pleas that, if Shafer's life is spared, he will *"die in prison"* after *"spend[ing] his natural life there."* *Id.*, at 39. Next, the State recites passages from the trial judge's instructions reiterating that "life imprisonment means until the death of the defendant." *Id.*, at 40.

The South Carolina Supreme Court, we note, never suggested that counsel's arguments or the trial judge's instructions satisfied *Simmons*. That court simply held *Simmons* inapplicable under the State's new sentencing scheme. 340 S. C., at 298, 531 S. E. 2d, at 528. We do not find the State's position persuasive. Displacement of "the longstanding practice of parole availability" remains a relatively recent development, and "common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole." *Simmons*, 512 U. S., at 177–178 (O'CONNOR, J.). South Carolina's situation is illustrative. Until two years before Shafer's trial, as we earlier noted, the State's law did not categorically preclude parole for capital

defendants sentenced to life imprisonment. See *supra*, at 46–47, n. 3, and 48.

Most plainly contradicting the State's contention, Shafer's jury left no doubt about its failure to gain from defense counsel's closing argument or the judge's instructions any clear understanding of what a life sentence means. The jurors sought further instruction, asking: "Is there any remote chance for someone convicted of murder to become elig[i]ble for parole?" App. 253; cf. *Simmons*, 512 U. S., at 178 (O'CONNOR, J.) ("that the jury in this case felt compelled to ask whether parole was available shows that the jurors did not know whether or not a life-sentenced defendant will be released from prison").[6]

The jury's comprehension was hardly aided by the court's final instruction: "Parole eligibility or ineligibility is not for your consideration." App. 240. That instruction did nothing to ensure that the jury was not misled and may well have been taken to mean "that parole *was* available but that the jury, for some unstated reason, should be blind to this fact." *Simmons*, 512 U. S., at 170 (plurality opinion); see 340 S. C., at 310, 531 S. E. 2d, at 534 (Finney, C. J., dissenting) ("[T]he jury's inquiry prompted a misleading response which suggested parole was a possibility."); *State* v. *Kelly*, 343 S. C. 342, 375, 540 S. E. 2d 851, 863–864 (2001) (Pleicones, J., dissenting in part, concurring in part) ("Without the knowledge that, if aggravators are found, a life sentence is not subject to being reduced by parole, or any other method of early release, the jury is likely to speculate unnecessarily on the possibility of early release, and impose a sentence of death

---

[6] Animating JUSTICE THOMAS' dissent is the conviction that the limited information defense counsel was allowed to convey and the judge's charge "left no room for speculation by the jury." *Post*, at 57. The full record scarcely supports, and we do not share, that conviction. Cf. 340 S. C. 291, 310–311, 531 S. E. 2d 524, 534 (2000) (Finney, C. J., dissenting) ("the jury's inquiry prompted a misleading response" that did not reveal the "simpl[e] truth").

based upon 'fear rather than reason.'" (quoting *Yarbrough* v. *Commonwealth,* 258 Va. 347, 369, 519 S. E. 2d 602, 613 (1999))).

In sum, a life sentence for Shafer would permit no "parole, community supervision, . . . early release program, . . . or any other credits that would reduce the mandatory life imprisonment," S. C. Code Ann. § 16–3–20(A) (2000 Cum. Supp.) (set out *supra,* at 42, n. 1); this reality was not conveyed to Shafer's jury by the court's instructions or by the arguments defense counsel was allowed to make.

## B

Ultimately, the State maintains that "[t]he prosecution did not argue future dangerousness," so the predicate for a *Simmons* charge is not present here. Brief for Respondent 42. That issue is not ripe for our resolution.

In the trial court, the prosecutor and defense counsel differed on what it takes to place future dangerousness "at issue." The prosecutor suggested that the State must formally *argue* future dangerousness. App. 161. Defense counsel urged that once the prosecutor *introduces evidence* showing future dangerousness, the State cannot avoid a *Simmons* charge by saying the point was not argued or calling the evidence by another name. See App. 161–162.

As earlier recounted, the trial judge determined that future dangerousness was not at issue, but acknowledged, at one point, that the prosecutor had come close to crossing the line. See *supra,* at 41–42, 43. The South Carolina Supreme Court, in order to rule broadly that *Simmons* no longer governs capital sentencing in the State, apparently assumed, *arguendo,* that future dangerousness had been shown at Shafer's sentencing proceeding. See *supra,* at 46–47; cf. *Kelly,* 343 S. C., at 363, 540 S. E. 2d, at 857 (recognizing that future dangerousness is an issue when it is "a logical inference from the evidence" or was "injected into the case through the State's closing argument"). Because the South

Carolina Supreme Court did not home in on the question whether the prosecutor's evidentiary submissions or closing argument in fact placed Shafer's future dangerousness at issue, we leave that question open for the state court's attention and disposition.

\* \* \*

For the reasons stated, the judgment of the South Carolina Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, dissenting.

While I concede that today's judgment is a logical extension of *Simmons* v. *South Carolina,* 512 U. S. 154 (1994), I am more attached to the logic of the Constitution, whose Due Process Clause was understood as an embodiment of common-law tradition, rather than as authority for federal courts to promulgate wise national rules of criminal procedure.

As I pointed out in *Simmons,* that common-law tradition does not contain special jury-instruction requirements for capital cases. Today's decision is the second page of the "whole new chapter" of our improvised "'death-is-different' jurisprudence" that *Simmons* began. *Id.,* at 185 (SCALIA, J., dissenting). The third page (or the fourth or fifth) will be the (logical-enough) extension of this novel requirement to cases in which the jury did *not* inquire into the possibility of parole. Providing such information may well be a good idea (though it will sometimes harm rather than help the defendant's case)—and many States have indeed required it. See App. B to Brief for Petitioner. The Constitution, however, does not. I would limit *Simmons* to its facts.

JUSTICE THOMAS, dissenting.

For better or, as I believe, worse, the majority's decision in this case is the logical next step after *Simmons* v. *South*

*Carolina,* 512 U. S. 154 (1994). Now, whenever future dangerousness is placed at issue and the jury's potential sentencing choice is between life without parole and death, the trial court must instruct the jury on the impossibility of release even if there is an alternative sentence available to the court under which the defendant could be released. However, even accepting that sentencing courts in South Carolina must now permit the jury to learn about the impossibility of parole when life imprisonment is a sentencing possibility, I believe that the court's instructions and the arguments made by counsel in Shafer's case were sufficient to inform the jury of what "life imprisonment" meant for Shafer. I therefore respectfully dissent.

In *Simmons,* a majority of this Court was concerned that the jury in Simmons' trial reasonably could have believed that, if he were sentenced to life, he would be eligible for parole. See *id.,* at 161 (plurality opinion); *id.,* at 177–178 (O'CONNOR, J., concurring in judgment). Therefore, Simmons' defense to future dangerousness—that because he sexually assaulted only elderly women, he would pose no danger to fellow inmates, see *id.,* at 157 (plurality opinion)—would not have been effective. To correct the jury's possible misunderstanding of the availability of parole, Simmons requested several jury instructions, including one that would explain that, if he were sentenced to life imprisonment, " 'he actually w[ould] be sentenced to imprisonment in the state penitentiary for the balance of his natural life.' " *Id.,* at 160. The trial court rejected this instruction and instead ambiguously informed the jury that the term life imprisonment is to be understood according to its " 'plain and ordinary meaning,' " which did "nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment.' " *Id.,* at 169–170.

In this case, by contrast, the judge repeatedly explained that "life imprisonment means until the death of the defendant." App. 201. The judge defined "life imprisonment" as

"incarceration of the defendant until his death," *id.*, at 209, and informed the jury that, if it chose the punishment of life imprisonment, the verdict form would read " 'We, the jury . . . unanimously recommend that the defendant, Wesley Aaron Shafer, be imprisoned in the state penitentiary for the balance of his natural life.' " *Id.*, at 213–214. Emphasizing this very point, Shafer's counsel argued to the jury that Shafer would never leave prison if he received a life sentence. See *id.*, at 192 ("The question is will the State execute him or will he just die in prison"); *id.*, at 194 ("putting a 19 year old in prison until he is dead" and "you can put him some place until he is dead"); *id.*, at 198 ("When they say give [him] life, he's not going home. . . . I'm just asking for the smallest amount of mercy it takes to make a man, a child spend the rest of his life in prison").

Given these explanations of what life imprisonment means, which left no room for speculation by the jury, I can only infer that the jury's questions regarding parole referred not to Shafer's parole eligibility in the event the jury sentenced Shafer to life, but rather to his parole eligibility in the event it did not sentence him at all. In fact, both of the jury's questions referred only to parole eligibility of someone "convicted of murder," *id.*, at 239–240 (" '[I]s there any remote chance that someone convicted of murder could become eligible for parole' "); *id.*, at 240 (" '[U]nder what conditions would someone convicted for murder be eligible [for parole]' "), rather than parole eligibility of someone *sentenced to life imprisonment.* Under South Carolina law, if the jury does not find an aggravating circumstance, someone convicted of murder could be sentenced to a term of 30 years' imprisonment or greater. See S. C. Code Ann. § 16–3–20(C) (2000 Cum. Supp.). If the jury thought Shafer's release from prison was a possibility in the event the judge sentenced him, they would have been correct. To be sure, under South Carolina's sentencing scheme, the jury did not need to know what sentencing options were available to the judge in the

event the jury did not find an aggravating circumstance. But that is precisely why the trial court's answers were appropriate. It explained what "life" meant for purposes of the *jury*'s sentencing option, and then added that "[p]arole eligibility or ineligibility is not for your consideration." App. 240.

The majority appears to believe that it could develop jury instructions that are more precise than those offered to Shafer's jury. It may well be right. But it is not this Court's role to micromanage state sentencing proceedings or to develop model jury instructions. I would decline to interfere further with matters that the Constitution leaves to the States.